IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs September 7, 2017

**STATE OF TENNESSEE v. DWIGHT MICHAEL ALSTON**

**Appeal from the Circuit Court for Tipton County**
**No. 8245      Joe H. Walker, III, Judge**

_____

**No. W2017-00184-CCA-R3-CD**

_____

A Tipton County Circuit Court Jury convicted the Appellant, Dwight Michael Alston, of first degree premeditated murder, and he received a life sentence. On appeal, the Appellant contends that the evidence is insufficient to support the conviction because it fails to show he premeditated the killing. Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and J. ROSS DYER, J., joined.

Melissa A. Downing (on appeal), Covington, Tennessee, and Leslie I. Ballin (at trial), Memphis, Tennessee, for the appellant, Dwight Michael Alston.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and James Walter Freeland, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

This case relates to the Appellant's shooting his wife, Johnnie Patricia Alston, on September 20, 2014. Michael Alston, the Appellant's and the victim's son, testified that he was born on November 4, 1993, and was twenty-two years old at the time of trial. In September 2014, he lived with his parents on Andy Drive in Drummonds, Tennessee. At some point, the Appellant had moved out of the house, but he moved back in about three months before the shooting.

Michael[1] testified that on the evening of Friday, September 19, his parents were at home arguing. His mother was dressed to go to a party, but the Appellant wanted "some family time" and did not want her to leave. The victim left in her blue Jaguar, and Michael went to his room to watch television. He fell asleep but was awakened by the garage door opening. He said that he knew the victim had returned home, that he heard his parents arguing in the garage, and that the Appellant sounded angry. Michael walked from his bedroom to the door that separated the house from the garage and looked through a window in the door. The Appellant was standing in front of the door, and the victim was standing in front of her car. Michael said that the victim "was begging him and stuff" and that the Appellant would not let the victim into the house. The Appellant kept pushing the victim backward toward the overhead garage door and kept telling Michael to "stay back."

Michael testified that he saw the Appellant holding a shotgun and that the victim "fell to the ground on her knees and started begging and everything." The victim was crying and told the Appellant, "I'm sorry. I'll do anything. I'll do -- I'll sign the papers." The Appellant told Michael, "[G]et back, [you] don't need to see this." Michael walked into the kitchen and heard a gunshot one to two minutes later. He said that he was scared, that he grabbed the cordless house telephone, and that he ran across the street and hid under a neighbor's vehicle. The Appellant came outside, and Michael crawled out from under the vehicle. He did not see the Appellant holding a gun and asked if the Appellant was okay, but the Appellant would not answer. The Appellant told Michael to call the police, got into the Appellant's Nissan, and drove away. Michael called 911.

On cross-examination, Michael testified that his mother left about 9:00 p.m. on September 19 and that he and the Appellant watched wrestling on television in the living room. About 9:20 p.m., Michael went to his room and fell asleep. Sometime before 10:00 p.m., he heard the front door of the house open and close. He went into the living room and looked outside but did not see the Appellant. The Appellant's Nissan was still in the driveway.

Michael acknowledged that he had been diagnosed with schizophrenia and said that he used to take trazodone and Risperdal because he spoke to the devil and heard demons talking to him. However, he stopped taking the medications because they gave him headaches. He acknowledged telling a police officer that he thought the Appellant had the gun just to scare the victim and that he did not think the Appellant was going to shoot her. He also acknowledged that the victim would come home sometimes at 2:00 or 3:00 a.m. and that one time, she did not come home until 6:00 or 7:00 a.m. On redirect

---

[1] Because some of the witnesses in this case share a surname, we will refer to them by their first names for clarity. We mean no disrespect to these individuals.

examination, Michael acknowledged that despite his mental health issues, he could remember details of events.

Deputy Wesley Ballard of the Tipton County Sheriff's Office (TCSO) testified that in the early morning hours of September 20, 2014, he transported someone to jail and pulled into the sheriff's office to turn in the paperwork for the arrest. While Deputy Ballard was sitting in his patrol car, the Appellant approached and said that "he was there to turn himself in, because he'd done something bad." Deputy Ballard asked what the Appellant did, and the Appellant said he shot his wife. Deputy Ballard checked the Appellant for weapons and found a .410 shotgun shell in the Appellant's front pants pocket. The officer learned from dispatch that the police were looking for the Appellant and took him into custody.

Corporal Eddie Walker of the TCSO testified that on September 20, 2014, he responded to a domestic call with possible shots fired at a home on Andy Drive. Michael Alston was standing on the road in front of the house and was pointing to the house. Corporal Walker described Michael as "[u]pset, scared." Corporal Walker and three other officers went into the home, and Corporal Walker immediately noticed a strong smell of gunpowder. The officers went into the garage, and Corporal Walker saw the victim lying face-down beside the overhead garage door. Blood was pooled around her face. About thirty minutes later, Corporal Walker learned that a vehicle possibly related to the shooting was at a residence in Atoka, Tennessee. He went to the home and found the Appellant's Nissan. Two .410 shotguns shells were in the passenger seat, and one of the shells was expended. The Appellant was not present.

Sergeant Sean Cullen of the TCSO testified that about 1:40 a.m. on September 20, 2014, he responded to the home on Andy Drive. He entered the front door and "could smell the odor of a discharged firearm inside the residence." The victim was lying on the garage floor and had a hole in the back of her head. Blood was around her head, and Sergeant Cullen saw brain matter but no wadding from a shotgun shell.

Dorothy Bounds, the Appellant's sister, testified that in September 2014, the Appellant had a good job working as a supervisor at the Army Corps of Engineers in Memphis. He and the victim had been married about 25 years. However, they had separated for a while in 2013, and the Appellant had lived with Dorothy and her family in Atoka for a few months. The Appellant told Dorothy that he was going to file for divorce, and Dorothy "thought it was best."

Dorothy testified that in 2014, the Appellant returned to live with the victim and their son on Andy Drive. Dorothy told the Appellant not to go back, but the victim wanted the Appellant to come home. Sometime after the Appellant returned, he told

Dorothy that he was going to proceed with the divorce. The Appellant was unhappy because the victim never wanted to stay home. One time, the Appellant visited the victim's place of employment and saw a card to the victim from "a man friend." Dorothy said that the victim "would go out with her friends, partying and drinking" and that the Appellant was "under stress." The Appellant was hoping that the victim would agree to divide their properly equally in the divorce so that he would not have to pay a lot of money to an attorney. However, in August or September 2014, the Appellant told Dorothy that the victim "wasn't going to sign."

Dorothy testified that about 1:00 or 1:30 a.m. on September 20, 2014, she and her husband were awakened by a knock on their front door. Dorothy's husband answered the door, and Dorothy got up to see who was there. The Appellant was standing in the foyer, and Dorothy did not see any blood on him. The Appellant was shaking and nervous and told Dorothy that he had come to say goodbye because he had killed the victim and was going to jail. Dorothy said she started crying and screaming and fell to the floor. The Appellant wanted Dorothy's husband to help him turn himself in to the police, so Dorothy's husband left with the Appellant in Dorothy's vehicle. About 2:00 or 2:30 a.m., law enforcement arrived and impounded the Appellant's Nissan.

On cross-examination, Dorothy testified that the Appellant and his son, Michael, were close. Michael had mental health issues, and the Appellant and Michael were together all the time because the victim was "mostly not home." Dorothy said that the victim was still going to church but "kept living the other lifestyle." Dorothy acknowledged that the Appellant did not want to pay $10,000 to $15,000 for a contested divorce and that he stayed with the victim to try to work out their marriage. She said that when the Appellant came to her house on September 20, he "seemed like a zombie."

Mose Bounds, Jr., Dorothy Bounds's husband, testified that he and Dorothy had been married forty-two years and that he had known the Appellant about forty-three years. The Appellant lived at the Bounds home for a period of time, but Mose never talked with the Appellant about the Appellant's marriage. At some point, the Appellant and the victim reconciled. Mose said that after the reconciliation, the Appellant "acted kind of disturbed some, you know, like depressed."

Mose testified that about 1:15 a.m. on September 20, 2014, the Appellant knocked on the front door. The Appellant told Mose to take him to the Tipton County Jail "because he had done something he shouldn't have done." The Appellant also told Dorothy to give him a hug because she would not see him anymore. Mose said the Appellant was "[i]n a state of shock" and that he drove the Appellant to the sheriff's office. Mose said that the Appellant did not tell him specifically what the Appellant had done but that "[i]n my mind, I knew about what he had done." He said that when they

- 4 -

arrived at the sheriff's office, the Appellant talked with an officer, and the officer took the Appellant into custody.

Dr. Paul Benson testified as an expert in forensic pathology that he performed the victim's autopsy. The victim was fifty-one years old; five feet, nine inches tall; and wearing a "CC Blues Club" wristband. She had a shotgun wound in the back of her head on the right side, and the wound caused "lethal injuries to her skull and brain." Specifically, the victim experienced "diffused skull fractures, subdermal hemorrhage, which is bleeding that happens on top of the brain, and pulpification of the brain, which means that the brain tissue is just destroyed." The trajectory of the gunshot was right to left, back to front, and slightly downward. Dr. Benson recovered multiple birdshot pellets and "a three petal plastic shot wad" from the victim's head. The gunshot entrance wound was circular and one-half inch in diameter, which was consistent with a .410 shotgun. Dr. Benson did not see any soot or searing around the wound and estimated that the muzzle of the gun was about three feet from the victim when the gun was fired. Toxicology tests did not show any drugs or alcohol in the victim's bloodstream. He said that the victim's cause of death was a shotgun wound to the head and that the manner of death was homicide.

On cross-examination, Dr. Benson acknowledged that "homicide" was a medical, not legal, term and that it meant "death caused by another." He said he could not determine the position of the victim's body at the time of the shooting.

Special Agent Mark Reynolds of the Tennessee Bureau of Investigation (TBI) testified that he went to the home on Andy Drive on September 20, 2014, to investigate the shooting, and he identified a diagram of the home's garage for the jury. Looking into the garage from the driveway, a Mercedes was parked on the left, and a Jaguar was parked on the right. The victim was lying behind the cars but in front of the large garage door. Agent Reynolds found a single-shot, .410 bolt action shotgun "propped up in the corner" of a closet in the garage. The victim was an employee on the naval base in Millington, and Agent Reynolds went there and photographed her office cubicle. He said that a greeting card was in the cubicle and that someone had written in the card, "'May God continue to bless and keep you, love you.'" The card was signed, "Joseph."

Barbara Thomas testified that she met the Appellant through her cousin in January 2014 and that they dated for a few months. The Appellant and the victim were separated, and the Appellant was living with his sister. Thomas said that the Appellant's divorce from the victim "was in motion" and that she and the Appellant talked about getting married. The Appellant told Thomas that the victim was not contesting the divorce but that she "didn't want to sign the papers." He also told Thomas that the victim was "going to sign one way or the other" and that "I can get a divorce one way or the other." The

- 5 -

Appellant thought their property would be "split down the middle," but he was concerned about their house and furniture. At some point, the Appellant broke up with Thomas by texting her that he had decided to reconcile with the victim.

Special Agent Chuck Baker of the TBI testified that he interviewed the Appellant at the sheriff's office on September 20, 2014. The interview was video-recorded, and the State played the recording for the jury. During the interview, the Appellant stated as follows: He and the victim were "getting ready to go through a divorce," and he had "just been constantly at her about coming home at 1 or 2 in the morning." On the night of September 19, 2014, the victim left their house. The Appellant left soon after and "followed her up to the store." He returned home, and he and his son watched television together. The victim returned home about 2:00 a.m. The gun was "right there in the closet." The Appellant picked it up and asked the victim "about this other guy." Their son came to the door while they were arguing, and the Appellant told him to go back inside the house. The victim was "pushing" the Appellant, and he "kept backing up." When he got to the rear of the car, he "bumped" the car, and his hand "hit the trigger." The gun was not pointed at the victim, and he did not know he had shot her. He looked down and saw blood. The Appellant returned to the closet and put another shell in the gun and a second shell in his pocket. He was going to shoot himself but heard his son calling and went outside. Agent Baker asked if the gun had "a safety," and the Appellant said yes. On cross-examination, Agent Baker acknowledged that the Appellant said throughout the interview that he did not intend to kill the victim.

Oberia Malone, the victim's sister, testified that the victim was a financial analyst at Navy Personnel Command. Malone worked in the same building as the victim, and they often had lunch together. One day, the Appellant "showed up" where they were eating lunch. The Appellant was quiet, did not eat with them, and did not interact with the victim.

Malone testified that on the Sunday before the victim's death, she went to the victim's home for Sunday dinner. After dinner, the victim went upstairs and "proceeded to separate items." Malone said that the victim was "torn" about divorcing the Appellant but that the victim was "tired of the situation." Malone stated that she and the victim often went out together at night. The victim would drink alcohol and dance, but Malone did not see the victim with other men. When the Appellant moved back home with the victim in 2014, he bought a Mercedes and tried to give it to the victim. However, the victim had her own car.

At the conclusion of Malone's testimony, the State rested its case. The Appellant did not present any proof, and the jury convicted him as charged of first degree premeditated murder. The trial court immediately sentenced him to life.

## II. Analysis

The Appellant contends that the evidence is insufficient to support the conviction because it fails to show he premeditated killing the victim. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). The element of premeditation is a question of fact for the jury. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. Bland, 958

S.W.2d at 660. In State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000), our supreme court delineated the following circumstances from which a jury may infer premeditation:

> [D]eclarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

The jury may also infer premeditation from the establishment of a motive for the killing and the use of multiple weapons in succession. State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004).

The Appellant concedes that he shot and killed the victim but contends that he did not do so with premeditation. In support of his claim, he notes that his son did not hear him make any declaration to kill the victim before the shooting, that he told his son to call 911 after the shooting, that the State failed to reveal any facts to support a motive, that the killing did not involve particular cruelty, that he did not attempt to destroy evidence or hide the crime, that he was visibly upset when he spoke with his sister, and that he turned himself in to law enforcement.

Taken in the light most favorable to the State, the proof at trial showed that the Appellant and the victim were in the process of getting a divorce and that the Appellant was upset that the victim would not sign the divorce papers. He also was upset that she was staying out late at night and suspected she was seeing other men. The Appellant told Barbara Thomas that the victim was going to sign the papers and that he would get a divorce "one way or the other." On the night of September 19, 2014, the victim wanted to go to a party, but the Appellant did not want her to leave. She left anyway, and he followed her for a short time. When she returned home about 1:00 a.m., the Appellant confronted her in the garage, and they argued. The Appellant was angry. He got the .410 shotgun out of the garage closet, and he pointed it at the victim. The Appellant begged for her life and said she would sign the divorce papers. The Appellant knew Michael was looking through the door and told his son to get away because "[you] don't need to see this." The victim kept moving backward from the front of the cars to the rear of the cars, and the Appellant followed her. He shot her when she got to the garage door. He then put the shotgun back into the closet, told his son to call 911, and drove to his sister's house where he confessed to killing the victim.

- 8 -

The Appellant's procuring a weapon, using the deadly weapon on the unarmed victim, returning the weapon to the closet after the killing, and calmness immediately after the killing support a jury's finding of premeditation in this case.  Moreover, his telling his son to get away because "[you] don't need to see this" shortly before the shooting could have been construed as a declaration to kill the victim.  Finally, although the Appellant contends that the State failed to present proof of a motive, multiple witnesses testified that the Appellant was upset about the victim's partying and staying away from home, her possible involvement with other men, and her refusal to sign the papers for an uncontested divorce.  In sum, the State presented numerous circumstances from which the jury could infer premeditation by the Appellant.  Accordingly, the evidence is sufficient to support the conviction.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE